UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

ELIAS A. CALDERON,                     )
         Plaintiff,                    )
                                       )
v.                                     )        Case No. 1:11-cv-173
                                       )        (Mattice/Carter)
MICHAEL J. ASTRUE                      )
Commissioner of Social Security        )
                                       )

REPORT AND RECOMMENDATION

This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule

72(b) of the Federal Rules of Civil Procedure for a Report and Recommendation regarding the

disposition of the plaintiff's Motion for Judgment on the Pleadings (Doc. 14) and defendant's

Motion for Summary Judgment (Doc. 20).

This action was instituted pursuant to 42 U.S.C. § 405(g) seeking judicial review of the

final decision of the Commissioner of Social Security denying the plaintiff a period of disability

and disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(I) and 423.

For reasons that follow, I RECOMMEND the decision of the Commissioner be

AFFIRMED.

Plaintiff's Age, Education, and Past Work Experience

Plaintiff was 45 years old at the time of the ALJ's decision (Tr. 204). He had completed

high school (Tr. 246). His preferred language was Spanish, and he reported that he could not

read or understand English (Tr. 241). Subsequently, he testified that he was able to write simple

words in English and read basic things (Tr. 76). Plaintiff has past work experience as a religious

worker, salvage laborer, and jewelry worker (Tr. 39-42, 243, 254).

Claim for Benefits

Plaintiff filed an application for Disability Insurance Benefits (DIB) on November 12, 2008, alleging disability since August 23, 2007 (Tr. 204-07). Plaintiff's application was denied initially and upon reconsideration (Tr. 88-92, 96-98). Plaintiff requested a hearing by an administrative law judge (ALJ) (Tr. 99). Hearings were held on August 25, 2010, and January 28, 2011 (Tr. 30-87). Plaintiff appeared, represented by counsel, and testified before ALJ Martha Bower, Stephen Kaplan, M.D., a medical expert, and Albert Sabella, a vocational expert also testified (Tr. 30-87). On February 4, 2011, the ALJ issued a decision finding Plaintiff was not disabled because he could perform a significant number of jobs in the economy (Tr. 13-24). The Decision Review Board selected the ALJ's decision for review (Tr. 1). When the Decision Review Board did not complete its review of Plaintiff's claim during the time allowed, the ALJ's decision became the agency's final decision (Tr. 1-3). 20 C.F.R. § 405.420. Plaintiff seeks judicial review of the Agency's final decision denying his claim for DIB. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Standard of Review - Findings of the ALJ

To establish disability under the Social Security Act, a claimant must establish he/she is unable to engage in any substantial gainful activity due to the existence of "a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20

2

C.F.R. § 404.1520. The following five issues are addressed in order: (1) if the claimant is engaging in substantial gainful activity he/she is not disabled; (2) if the claimant does not have a severe impairment he/she is not disabled; (3) if the claimant's impairment meets or equals a listed impairment he/she is disabled; (4) if the claimant is capable of returning to work he/she has done in the past he/she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy he/she is not disabled. *Id.* If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520; *Skinner v. Secretary of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990). Once, however, the claimant makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he/she can perform considering his/her age, education and work experience. *Richardson v. Secretary, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can

go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir.

1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health*

*and Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

After considering the entire record, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.    The claimant has not engaged in substantial gainful activity since August 23, 2007, the alleged onset date (20 C.F.R. 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: status post right shoulder arthroscopy; status post healed distal radius fracture on the right; low back pain, a history of a left upper extremity injury; a history of asthma (20 C.F.R. 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b), except pushing and pulling and overhead reaching with the right upper extremity is limited to an occasional basis only; the claimant can occasionally climb, stoop, kneel and crouch but cannot crawl; the claimant should avoid concentrated exposure to pulmonary irritants; the claimant can perform only occasional gripping, grasping, twisting, turning and fine manipulation using the left upper extremity.

6.    The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565).

7.    The claimant was born on _____ __, 1965, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563).

8.    The claimant is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English (20 C.F.R. 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional

capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 23, 2007, through the date of this decision (20 C.F.R. 404.1520(g)).

(Tr. 15-23).

<u>Issues Raised</u>

I.      The ALJ's Credibility Determination is Invalid Because it is Unsupported by the Medical Evidence of Record

II.     The ALJ Improperly Relied on an Independent Medical Evaluation that is Inconsistent with the Record as a Whole

III.    The Light Residual Functional Capacity Does not Encompass the Total Limiting Effects of Multiple Impairments

<u>Relevant Facts</u>

<u>Plaintiff's Statements</u>

Plaintiff alleged disability due to pain in his back, left leg, and right shoulder; pain and weakness in the right wrist; numbness in the left leg and foot; asthma; depression; and anxiety (Tr. 63, 242, 272, 281).  He stated he could not sit or stand for long periods without experiencing numbness in his left leg and foot; he could not lift over five pounds; and he experienced numbness in his right wrist and hand (Tr. 242).  He testified he could sit for 30 minutes and walk for 20 minutes (Tr. 71).  Plaintiff testified he took Naprosyn for his right shoulder pain (Tr. 66-67).  It helped to reduce his pain from a seven to a three on a 10-point scale, but made him dizzy.  Before he took his medication, his pain was at a seven on a 10-point scale and after he took medication, it reduced to a three (Tr. 66).  Plaintiff indicated that prior to undergoing shoulder

5

surgery, his pain was constant, and after the operation he had pain when it rained or snowed (Tr. 68). He testified that he had constant low back pain. With regard to his right wrist, he stated that when he closed his hand or moved it to one side to drive, he experienced pain. (Tr. 67). He took Advil, which helped a little. From Plaintiff's testimony it appears Plaintiff may have also taken another medication for his shoulder (Tr. 68).

Plaintiff stated he was not in treatment for depression, and he did not take any medication for it (Tr. 68-69).

Plaintiff testified he lived with his wife and three children, ages 14, 12, and 10 (Tr. 69). His wife worked, he took the children to school, and for the past six months, he had been doing community service for two to three hours, three to four days per week (Tr. 69). He drove to distribute free food. He also attended church two to three days per week. He helped out with household chores, including vacuuming and sweeping, but he did not do laundry, due to the bending involved. (Tr. 70).

Plaintiff testified that about 30 years ago, he injured his left hand. He stated that he could not close his fingers, and thus could not grasp. He experienced very little pain in his left hand. (Tr. 72). He testified he was able to work despite his left hand injury, and he was able to drive a truck and remove items such as rugs, ceiling tiles, and sheet rock ceilings, when doing building demolition work. He used hammers, knives, and saws with his right hand, and he used his left hand to guide the tools. (Tr. 73).

Medical Evidence

Many years prior to his alleged onset of disability, Plaintiff fractured his left wrist, developed gangrene of his left finger, and lost that finger. He also underwent multiple surgeries

6

which left his left wrist deformed. Although the medical records were not in the file, Plaintiff's medical history was referred to by Dr. Giles and Dr. Kaplan (Tr. 34, 437).

On August 23, 2007, the date Plaintiff alleged his disability began, Plaintiff went to the emergency room after falling from a platform while working and injuring his right shoulder, elbow, and wrist (Tr. 292-98).

Andrew Green, M.D., an orthopedist, saw Plaintiff for his shoulder pain beginning in December 2007 (Tr. 333). An MRI arthrogram indicated a possible superior labral tear (Tr. 332). Dr. Green recommended physical therapy, a corticosteroid injection, and indicated Plaintiff could continue light duty work with no lifting greater than 10 pounds, no work above shoulder level, and no repetitive use (Tr. 332-33). Plaintiff continued conservative treatment but noted no improvement (Tr. 329-31). On April 7, 2008, Plaintiff underwent surgery on his right shoulder for a rotator cuff repair, a resected clavicle, and a labrum repair (Tr. 305). Three weeks post-surgery, Plaintiff noted some improvement, but indicated some numbness and tingling in some of his fingers, for which he subsequently set up an appointment with Dr. DaSilva (Tr. 324). On May 28, 2008, Plaintiff's range of motion had improved, but he still complained of pain (Tr. 324). On July 8, 2008, three months after his surgery, Plaintiff reported improvement since his last visit in May (Tr. 323). Dr. Green noted that Plaintiff's shoulder was gradually progressing, and he should continue rehabilitation (Tr. 323). He indicated a follow-up in six weeks, at which time he would release Plaintiff to modified duty work status (Tr. 323). Dr. Green also ordered electrodiagnostic testing to rule out the possibility of a rotator cuff tear (Tr. 323). Subsequent, electrodiagnostic testing of Plaintiff's right upper extremity was negative for carpal tunnel syndrome or other abnormalities (Tr. 408-09). On August 27, 2008, Dr. Green recommended a

7

work conditioning program and recommended Plaintiff remain out of work until he progressed in the work conditioning program (Tr. 322). On October 7, 2008, an MRI reflected only a partial re-tear of the supraspinatus tendon (Tr. 435). On November 18, 2008, Dr. Green indicated that he was unable to explain Plaintiff's ongoing complaints on an anatomic basis (Tr. 320). He recommended that Plaintiff be limited from lifting more than 10 pounds, performing repetitive pushing or pulling, or reaching above the shoulder with the right arm, and he discharged Plaintiff as having reached maximum medical improvement (Tr. 320).

Plaintiff was followed by Manuel DaSilva, M.D., an orthopedist, for his right wrist injury. On January 18, 2008, Plaintiff reported a medical history for a severe traumatic event of the left wrist 26 years ago. Dr. DaSilva tested both arms and noted x-rays of the right wrist revealed a healing right distal radius fracture (Tr. 405). He injected Plaintiff's right wrist with steroids and in February 2008, added Naprosyn and a splint and opined Plaintiff could continue to work light duty (Tr. 406). On June 11, 2008, Dr. DaSilva reported that Plaintiff had good range of motion of the right wrist and good motion of the fingers, with x-rays demonstrating complete healing of the fracture (Tr. 407). He indicated that Plaintiff had reached maximum medical improvement, with no impairment of the right wrist and released Plaintiff to return to work at full duty as far as his wrist was concerned; Dr. DaSilva did note that Plaintiff had limited function in his left hand (Tr. 407).

On August 7, 2008, Plaintiff saw Randall Updegrove, M.D., an orthopedist, for back pain. Plaintiff told Dr. Updegrove that he noted back pain in February 2008, when he had been working light duty, and the work involved a lot of bending, vacuuming, and cleaning, and then in June 2008, his back pain had worsened when he was in physical therapy. (Tr. 312). He did not

2

indicate that he had injured his back at the time of the August 2007 accident (Tr. 312, 317-18). On exam, Plaintiff had some left lumbosacral tenderness at the SI joint. His hip exam was benign and neurological exam of the lower extremities was intact. Dr. Updegrove's impression was mechanical low back pain/possible SI involvement. He recommended physical therapy and advised Plaintiff to sit and stand as tolerated and lift no more than 15 pounds and avoid repetitive bending and lifting. (Tr. 313).

Dr. Updegrove continued to see Plaintiff through October 2008 (Tr. 312-16). On September 23, 2008, Plaintiff complained of worsening pain with radiation into the left leg. Dr. Updegrove ordered an MRI and prescribed Vicodin. (Tr. 315). On September 26, 2008, a lumbosacral MRI showed some grade I anterolisthesis with bilateral spondylosis, narrowing of both neural foramina with bulging disc contracting the undersurface of the exiting L5 nerve roots bilaterally, and a small protrusion at L4-5 (Tr. 311). On October 1, 2008, Dr. Updegrove noted that on exam, Plaintiff had tenderness in the paraspinal region of the lumbar spine, left sciatic notch, and positive straight leg raising on the left. He reviewed Plaintiff's treatment options, and after discussion referred Plaintiff for a consultation regarding injections and advised him to otherwise continue with conservative measures; he recommended Plaintiff remain at light work regarding his lower back. (Tr. 316).

Plaintiff saw Sadia Iftikhar, M.D., his primary care physician, between May 2008 and March 2009 (Tr. 342-62, 427-30). In May 2008, Dr. Iftikhar treated Plaintiff for, *inter alia*, allergy complaints, and he noted a history of asthma (Tr. 342). On June 3, 2008, Plaintiff complained of low back pain for a few months (Tr. 344). His musculoskeletal and neurological examinations were negative (Tr. 344). In November 2008, it was noted that Plaintiff had full

3

range of back motion (Tr. 349, 351). On March 10, 2009, Dr. Iftikhar again reported full range of motion of Plaintiff's back (Tr. 427).

On June 11, 2010, Plaintiff sought care at the Kennedy Clinic in Tennessee and then through Volunteers in Medicine beginning on October 21, 2010 (Tr. 448-58). He complained of pain in the right shoulder, left lower back and leg, and a right wrist injury, as well as a history of left arm problems (Tr. 449).

<u>Consultative Evaluations</u>

On October 16, 2008, Dana Sparhawk, M.D., performed an independent medical examination of Plaintiff (Tr. 398-404). Plaintiff told Dr. Sparhawk that on August 23, 2007, he fell and landed on his elbow and shoulder and twisted his back (Tr. 398). He stated that he had back pain since his original injury, and it worsened after physical therapy for his shoulder (Tr. 399). Dr. Sparhawk reviewed the diagnostic records and treatment notes and performed a physical examination (Tr. 400-02). On exam, Plaintiff had a normal gait; he had full range of motion of the lumbar spine, with complaints of pain; he had normal lower extremity reflexes, intact muscle strength in all groups, and intact sensation. Straight leg raising was negative. (Tr. 402). His right shoulder had full motion with complaints of pain, but with good strength. He had diffuse tenderness in his right wrist, but he had full motion, normal grip strength, and intact sensation in the right upper extremity. (Tr. 403). Dr. Sparhawk asked Plaintiff on three occasions during the exam where he experienced the most back pain, and Plaintiff gave different answers on each occasion (Tr. 402-03). Dr. Sparhawk assessed nonspecific chronic back pain, right shoulder pain status post arthroscopic surgery, diffuse wrist pain, and healed fracture of the distal right radius (Tr. 403). He concluded that the Plaintiff had ongoing pain, subjective

4

complaints involving his wrist which neither he, nor Dr. DaSilva, could explain, and he did not find evidence of any underlying disability of the wrist (Tr. 403). As to Plaintiff's shoulder complaints, Dr. Sparhawk noted Plaintiff had excellent motion and strength, with no explanation for his ongoing subjective complaints, and he stated that there was no disability or impairment of the shoulder. Dr. Sparhawk finally observed that Plaintiff had provided inconsistent information regarding his back pain and its onset, as well as having multiple inconsistencies during the examination. He indicated that Plaintiff had an essentially normal MRI for his age. He opined that there was no evidence of any disability as far as Plaintiff's back. Dr. Sparhawk opined that no further treatment was needed, no further prescription medication or rehabilitation was warranted, and Plaintiff was ready to return to work without restriction. (Tr. 404).

On September 12, 2010, Plaintiff underwent a consultative examination with Wesley Giles, M.D. (Tr. 437-47). Plaintiff noted problems with his left upper extremity, right wrist and shoulder, lower back, and left leg (Tr. 437). On examination, he had a normal gait, could walk on his heels and toes, and perform a deep knee bend (Tr. 438). He had normal motion in his dorsolumbar spine, knees, ankles, and right wrist (Tr. 440-41). He had some limitation of motion of the right shoulder (Tr. 440). The left shoulder was normal as were the elbows; there was right wrist pain with normal range of motion; and left wrist deformity and scarring, limited range of motion, diminished sensation and an absent left 5th digit, with limited active motion of the 3rd and 4th fingers (Tr. 438-39). The lower extremities had full motion with intact strength and sensation and with positive straight leg raising bilaterally. Dr. Giles also reviewed the medical records. He concluded that Plaintiff could stand and walk for 6 out of 8 hours per day with unrestricted sitting, and he was limited to pushing and pulling up to 10 pounds, with

5

occasional fingering, handling and reaching, and no ladders or heights or heavy machinery while using medications. He could occasionally stoop or kneel, but could not crawl (Tr. 439).

Reviewing Physicians

On December 24, 2008, Thomas Bennett, M.D., a non-examining State agency physician, reviewed the record evidence, including evidence relating to Plaintiff's right shoulder and wrist, low back problems, and asthma (Tr. 335, 338). He also considered opinions regarding Plaintiff's physical capacities (Tr. 340). He opined that Plaintiff could perform light exertional work, with frequent climbing ramps and stairs, occasionally climbing ladders, ropes, and scaffolds; but no crawling (Tr. 336). He had limited ability to reach in all directions with his right upper extremity and should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation (Tr. 338). On April 28, 2009, John Bernardo, M.D., a non-examining State agency physician, reviewed the updated medical record and affirmed Dr. Bennett's opinion (Tr. 396).

Steven Kaplan, M.D., a specialist in internal medicine and rheumatology, testified at the hearings (Tr. 77). Dr. Kaplan testified, that although there was not a direct examination of Plaintiff's left hand in the record, it was obvious that he was missing his last digit and there was atrophy noted in the history (Tr. 81). Dr. Kaplan opined that Plaintiff was markedly limited in using his left hand in terms of strength (Tr. 78, 81). He noted that Plaintiff had a fracture of the right wrist, and although it appeared to have healed normally, he continued to complain of pain. With regard to his right shoulder, he had some limitation on overhead use. Dr. Kaplan noted Plaintiff had been limited by doctors regarding lifting due to his right upper extremity and back. He opined that Plaintiff be limited to light duty with some limitation of his upper extremity in terms of manipulative limitations and no repetitive overhead reaching. He went on to state that

6

the manipulative limitation was based on Plaintiff's subjective pain, and there was nothing objective in the record supporting the limitation. (Tr. 82).  At the second hearing, Dr. Kaplan reviewed the medical record, including the consultative exam by Dr. Giles (Tr. 34-39).  He opined that Plaintiff was significantly limited using his left hand and wrist (Tr. 38).  He was limited in the use of the right arm overhead and limited to pushing and pulling 10 pounds or less (Tr. 39).

<u>Testimony of the Vocational Expert</u>

The ALJ asked the VE to assume that an individual with Plaintiff's age, education, and vocational background who was limited to light work; however, he was limited to lifting or carrying 10 pounds; occasionally pushing and pulling with the right dominant upper extremity; occasionally climbing ropes, ladders, or scaffolds, stooping, kneeling, crouching; no crawling; and no concentrated exposure to pulmonary irritants; occasional overhead reaching with the right upper extremity; and no gripping, grasping, twisting, turning or fine manipulation with the left hand (Tr. 42-43).  The VE testified that at the light exertion level, the individual could perform 1,000 jobs in the region as a racker, inspector of surgical instruments, and food conveyor job (Tr. 44, 51).  When the ALJ changed the hypothetical and indicated occasional gripping, grasping, twisting, turning, and fine manipulation with the left hand, the VE indicated that Plaintiff could perform light work as a machine tender of plastic products, an inspector of plastic products, and an inspector of electrical or electronic equipment and there were 12,000 jobs in the regional economy (Tr. 56-58).

Analysis

Was the ALJ's Credibility Determination Properly Supported by the Medical Evidence of Record?

Plaintiff argues the ALJ made several inaccurate and incomplete references to the record in attempting to lessen Plaintiff's credibility in support of assessing a Light Residual Functional Capacity. Plaintiff points to the ALJ's discussion of whether surgery was recommended by Dr. Updegrove and whether Plaintiff was untruthful to Dr. Sparhawk regarding his daily activities. Plaintiff then points to the question of whether Plaintiff told Dr. Giles he was left hand dominant, which was contradicted by the record (Doc. 15, Plaintiff's Brief p. 9-12).

When evaluating a claimant's subjective complaints of symptoms such as pain, an ALJ must first determine whether the claimant has established a medically determinable impairment which could reasonably be expected to produce the pain or other symptoms alleged. *See* 20 C.F.R. § 404.1529(b). If so, the ALJ then evaluates the intensity and persistence of the symptoms in order to determine their effect on the claimant's ability to work. *See* 20 C.F.R. § 404.1529(c). In doing so, the ALJ considers all of the available evidence, including objective medical evidence, medical opinions, and medical treatment history. 20 C.F.R. § 404.1529(c); SSR 96-7p.

In this case, the ALJ considered the record evidence and found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not fully credible (Tr. 18). "[A]n ALJ's credibility determinations about the claimant are to be given great weight . . . ." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007). The ALJ considered many factors in evaluating Plaintiff's credibility. The ALJ compared Plaintiff's complaints with the objective medical evidence, discussed above, and found many normal

8

objective findings which undermined Plaintiff's allegations of total disability (Tr. 22, 402, 407, 438, 440-41). Dr. Green indicated that he could not explain Plaintiff's ongoing pain complaints based on his examination findings (Tr. 320). The ALJ also concluded Plaintiff's allegations of disability were not supported by the medical opinions of record, also discussed above (Tr. 21). As the Commissioner argues, none of the doctors suggested limitations as restricting as Plaintiff alleged.

The ALJ considered that, after settling his workers compensation claim in April 2009, Plaintiff did not produce any medical records until June 2010 (Tr. 21, 219). Plaintiff's lack of treatment during this period called into question the severity of his conditions. The ALJ also considered Plaintiff's daily activities. *See* 20 C.F.R. § 404.1529(c)(3)(I) (ALJ may consider daily activities in assessing severity of symptoms). Plaintiff testified that he took his children to school (Tr. 69). He did community service for two to three hours, three to four days per week, which involved driving to distribute free food (Tr. 69-70). He attended church two to three days per week. He helped out with household chores, including vacuuming and sweeping. (Tr. 70). These activities suggest that Plaintiff was not as limited as he claimed.

Next, the ALJ considered inconsistencies in Plaintiff's statements. *See* 96-7p (the consistency of statements is a strong indication of credibility). Plaintiff testified that his medication made him dizzy, however, there was no indication that he reported this to his doctors (Tr. 22, 66). The ALJ also considered that during Dr. Sparhawk's examination of Plaintiff, Dr. Sparhawk asked Plaintiff on three separate occasions where Plaintiff experienced the most back pain, and Plaintiff gave three different answers (Tr. 20, 402-03). In addition, the ALJ considered that when Plaintiff underwent a consultative mental examination with Dr. Davis, he made a

9

number of complaints which were not evident elsewhere in the record, such as poor sleep due to pain and anxiety, lack of interests, passive suicidal ideation, diminished concentration and memory, and feelings of helplessness and hopelessness (Tr. 20, 377-78).

Plaintiff takes issue with regard to several other inconsistencies considered by the ALJ (Doc. 15, Plaintiff's Brief, pp. 9-12). Plaintiff argues that the ALJ erred in discounting his credibility based on inconsistencies in his statements regarding when his back pain originated (Doc. 15, Plaintiff's Brief, pp 9-10). Plaintiff contends that the origin of his back pain was immaterial to the credibility determination. However, as the Commissioner argues, the consistency of statements is a strong indication of credibility. *See* SSR 96-7p. I conclude it was reasonable for the ALJ to consider that Plaintiff made different statements to two doctors regarding when he first hurt his back. The ALJ also considered that, although Plaintiff told Dr. Sparhawk that Dr. Updegrove recommended surgery, Dr. Updegrove's notes did not demonstrate that he recommended this (Tr. 19). Plaintiff argues that Dr. Updegrove indicated that he reviewed treatment opinions "at length" and that such may have included a discussion regarding surgery (Doc. 15, Plaintiff's Brief, at 10). In the "Plan" section of the treatment note, Dr. Updegrove reported that he reviewed Plaintiff's treatment options at length (Tr. 316). He noted that he was referring Plaintiff for a consultation regarding injections, which Plaintiff had no obligation to pursue; he then stated, "Otherwise continue with conservative measures. Remain at light work regarding his lower back ." (Tr. 316). These remarks seem inconsistent with a recommendation of surgery, which is not a conservative measure. Thus, the ALJ's conclusion appears to me to be reasonable.

Next, Plaintiff refers to the ALJ's consideration of the evidence that Plaintiff told Dr.

10

Giles he was left hand dominant, and this was contradicted by the record evidence (Doc 15, Plaintiff's Brief at 11-12, referring to Tr. 21). Dr. Giles' report does indicate in the "Social History" section that Plaintiff indicated that he was left-handed (Tr. 438). Even if this was a typographical error, as Plaintiff suggests, it was not erroneous for the ALJ to note that such inconsistency existed (*See* Tr. 266). Finally, Plaintiff argues that the ALJ erred in considering his failure to report his volunteer work to Dr. Sparhawk when discussing his daily activities (Doc. 15, Plaintiff's Brief at 10). Plaintiff contends he did not begin his volunteer work until February 2010, well after Dr. Sparhawk's report (Doc 15., Plaintiff's Brief at 10). Even if the ALJ erred in considering this as an inconsistency, I agree with the Commissioner that in light of the numerous other inconsistent statements made, as well as the other considerations discussed above, any error made in this regard would not undermine the ALJ's credibility finding to the extent it would require either reversal or remand.

I conclude there was substantial evidence to support the ALJ's finding that Plaintiff was not fully credible regarding the extent of limitations he claimed. An ALJ's credibility finding is entitled to substantial deference because of the ALJ's unique opportunity to observe the claimant and judge his subjective complaints. *See Jones v. Comm'r of Social Security*, 336 F.3d 469, 476 (6th Cir. 2003).

Did the ALJ Improperly Rely on an Independent Medical Evaluation that was Inconsistent with the Record as a Whole?

Plaintiff argues the ALJ could not consider Dr. Sparhawk's examination in denying his claim, because Dr. Sparhawk's examination notes were inconsistent with the record evidence (Doc. 15, Plaintiff's Brief at 12-13). As discussed above, Dr. Sparhawk found Plaintiff had no limitations (Tr. 404). It is clear, however, that the ALJ did not completely rely on Dr.

11

Sparhawk's opinion, because he found numerous limitations in Plaintiff's functional abilities (Tr. 17). To the extent that Plaintiff focuses on Dr. Sparhawk's findings relating to his left hand deformity, it is clear that the ALJ did not give weight to Dr. Sparhawk's findings regarding this impairment. I agree with the Commissioner that Plaintiff's attempt to undermine the ALJ's entire decision based on his consideration of this one opinion must fail. The ALJ clearly did not afford weight to Dr. Sparhawk's opinion to the extent that it was inconsistent with the remainder of the record.

Did the Assessment Plaintiff Could Perform Light Work Encompass the Total Limiting Effects of Plaintiff's Impairments?

The ALJ found that Plaintiff could perform a range of light work activity despite his impairments (Tr. 17). Considering Plaintiff's vocational profile and RFC, an impartial vocational expert testified that Plaintiff could perform a significant number of jobs in the economy (Tr. 44-58). Based on that testimony, the ALJ found that Plaintiff was not disabled and not entitled to DIB (Tr. 22-23).

Plaintiff correctly points out that light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. Plaintiff argues that an RFC for even a reduced range of light work as posed by the ALJ would still require ability to lift up to *twenty* pounds. He then points to the medical record and testimony of the medical expert. Other than Dr. Sparhawk who assessed no limitations, the other physicians have not assessed the capability to perform a full range of light work. Plaintiff argues, the ALJ's Light RFC is clearly contrary to the assessments of three treating physicians, a medical expert, and a physical therapist (Dr. Green, Dr. Kaplan, Dr. DaSilva, Dr. Giles, and Ali Resenblum, M.S. PT, CWCE, at Tr. 320, 35 - 39, 407, 439, 419-20, respectively). Essentially these sources

12

restrict plaintiff to lifting 10 pounds.

The Commissioner has a different view and argues the ALJ properly determined Plaintiff's RFC in light of the record evidence, including the objective medical evidence and the medical opinions. He points out that to the extent the evidence supported limitations on Plaintiff's functional abilities, the ALJ incorporated such limitations into his RFC finding as can be seen from the following findings in the record. The ALJ considered the objective medical finding relating to Plaintiff's various impairments. As of June 2008, Plaintiff had full range of motion in his right wrist and good motion of the fingers, and an x-ray indicated complete healing of his wrist fracture (Tr. 407). In October 2008, Plaintiff had a normal gait and normal lower extremity reflexes, intact muscle strength in all groups, and intact sensation (Tr. 402). Straight leg raising was negative (Tr. 402). To the extent that the evidence indicated that Plaintiff had full range of motion of the lumbar spine and right shoulder, but complained of pain (Tr. 403), the ALJ found Plaintiff could perform only light work with a limitation on overhead reaching and with a number of postural limitations (Tr. 17). In September 2010, Plaintiff again demonstrated a normal gait, and he could walk on his heels and toes, and perform a deep knee bend (Tr. 438). He had normal motion in his dorsolumbar spine, knees, ankles, and right wrist (Tr. 440-41). He had some limitation of motion of the right shoulder (Tr. 440), which was accommodated by the ALJ's RFC finding. Further, to the extent that Plaintiff exhibited diminished sensation and an absent left 5th finger, with limited active motion of the 3rd and 4th fingers (Tr. 438-39), the ALJ significantly limited Plaintiff's ability to use his left hand by finding he could only occasionally grip, grasp, twist, turn, and perform fine manipulation with his left hand (Tr. 17). I conclude the ALJ adequately accommodated his left hand limitations. The ALJ considered the objective

13

medical findings and reasonably accounted for the limitations indicated by the evidence and incorporated such in his RFC finding.

Plaintiff also argues that the ALJ's RFC finding was contrary to the opinions of Dr. Green, Dr. DaSilva, Dr. Updegrove, Dr. Kaplan, and Dr. Giles. Pl. Br. at 14-15. As the Commissioner notes, all of these medical sources suggested that Plaintiff could return to work with limitations (Tr. 38-39, 320, 407, 313, 439).

Plaintiff also refers to the opinions of Dr. DaSilva and Dr. Kaplan to support his contention that he had greater left hand limitations than found by the ALJ. Dr. DaSilva indicated that Plaintiff had very limited function of his left hand and Dr. Kaplan testified that Plaintiff had little capacity to perform grasping, gripping, and fine manipulation with his left hand (Doc. 15, Plaintiff's Brief at 14-16). However, the ALJ also considered Plaintiff's testimony that he had been able to work despite his left hand limitations (Tr. 73). Plaintiff testified that he was able to drive a truck and remove items such as rugs, ceiling tiles, and sheet rock ceilings, when doing building demolition work (Tr. 73). In addition, he stated that he used hammers, knives, and saws with his right hand, and he used his left hand to guide the tools (Tr. 73). The record contained no evidence suggesting that Plaintiff's left hand condition worsened from the time he was working. Thus, Plaintiff's ability to perform his past work activities supported the ALJ's RFC finding of only occasional limitations on his left hand.

Plaintiff also contends that Dr. Green, Dr. Updegrove, Dr. Giles, and Dr. Kaplan indicated greater limitations on his ability to lift, push, pull, or reach than found by the ALJ (Doc. 15, Plaintiff's Brief at 14). However, Dr. Green indicated that there was no objective evidence supporting Plaintiff's pain complaints (Tr. 320). There were other medical opinions of

14

record which were inconsistent with the above opinions. For example, Dr. Sparhawk examined Plaintiff and found no limitations (Tr. 404). And, Dr. Bennett and Dr. Bernardo, who were able to review much of the medical record, opined that Plaintiff was capable of a range of light work (Tr. 334-41, 396). I conclude the ALJ reasonably weighed the medical source opinions in light of the record evidence and determined Plaintiff's RFC.

However, I do agree that a finding by the ALJ that Plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) would not be supportable but for the additions restriction he put on that assessment. His specific finding was as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b), except pushing and pulling and overhead reaching with the right upper extremity is limited to an occasional basis only; the claimant can occasionally climb, stoop, kneel and crouch but cannot crawl; the claimant should avoid concentrated exposure to pulmonary irritants; the claimant can perform only occasional gripping, grasping, twisting, turning and fine manipulation using the left upper extremity.

That finding does not specifically restrict Plaintiff to lifting less than 20 pounds. However, as the Commissioner argues, the ALJ's hypothetical question to the VE did include a limitation of lifting and carrying no more than 10 pounds (Tr. 39, 42, 55, 313, 316, 320). Therefore even though the ALJ's RFC finding did not include such a limitation, at step five, the ALJ relied on the VE's testimony in response to a hypothetical that did include the 10-pound lifting limitation.

In his opinion the ALJ acknowledges Plaintiff does not have the residual functional capacity to perform the full range of light work. The ALJ notes:

> If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.18. However, the claimant's ability to perform all or substantially all of the

requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as racker, inspector of surgical instruments, and conveyor belt machine tender (numbering 1000 positions in the Rhode Island/Southeastern Massachusetts regional economy); as well as machine tender of plastic products, inspecting such products, and inspecting electrical and electronic equipment (numbering 12,000 positions in the regional economy).

Tr. 23

It is apparent from that language and the questions posed by the ALJ to the VE (Tr. 42, 55-57), that his actual residual functional capacity assessment was a limited range of light work that included the lifting restriction of 10 pounds. I conclude this was the actual finding of the ALJ and that remand would serve no useful purpose. I note that there was evidence in the form of the opinions of the non-examining State Agency Physicians that Plaintiff could in fact perform a full range of light work. However, it appears clear from the record that the ALJ actually was making a finding Plaintiff could only perform a limited range of light work that included the 10 pound restriction. The VE testified that there were substantial numbers of jobs Plaintiff could perform with that added limitation. Therefore, I conclude there is substantial evidence to support the decision.

16

<u>Conclusion</u>

For the reasons stated herein, I conclude there is substantial evidence to support the conclusion of the ALJ and I therefore RECOMMEND the Commissioner's decision be AFFIRMED.

I further RECOMMEND defendant's Motion for Summary Judgment (Doc. 20) be GRANTED, and plaintiff's Motion for Judgment on the Pleadings (Doc. 14) be DENIED and the case be DISMISSED.[1]

S /William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[1]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general.  *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).

17